

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00175-CV

IN THE INTEREST OF Z.B., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-98709J-13

----------

## MEMORANDUM OPINION[1]

----------

After a bench trial, the trial court terminated H.B.'s (Mother's) parental rights to her daughter, Z.B. (Zoey).[2] In one issue, Mother contends the evidence

---

[1] *See* Tex. R. App. P. 47.4.

[2] We refer to Z.B. by the fictitious name "Zoey." *See* Tex. Fam. Code Ann. § 109.002(d) (West 2014); Tex. R. App. P. 9.8(b)(2).

is legally and factually insufficient to support the finding that termination is in Zoey's best interest. We affirm.

## I. The Evidence

*The Removal*

The Texas Department of Family and Protective Services (the Department) received a referral in June 2013 after Zoey was born exposed to marijuana. The referral also included allegations that Mother had tested positive for marijuana during the pregnancy and had previously attempted suicide. The Department's investigation supervisor (the investigator) testified that Mother confirmed at the hospital that she had used marijuana during her pregnancy, that she had been admitted to a psychiatric ward the previous year due to an attempted suicide, and that she had been diagnosed as bipolar. Mother, who was seventeen at the time, admitted smoking marijuana since she was fourteen. The investigator testified Mother disclosed that her own mother (Grandmother) was an active crack addict and would have access to both Mother and Zoey. The investigator said Mother indicated she lived primarily with her grandmother (Great Grandmother) or other relatives. The investigator stated Mother had no job and no realistic plan regarding how she was going to take care of Zoey. The investigator related that Mother had admitted she was not ready to care for Zoey and, further, that she would not be ready until she was eighteen. As for Zoey, the investigator determined she had aspiration issues, had a high level of medical needs, and would require ongoing care from a specialist. The

2

investigator concluded it was clear Mother would not be able to meet Zoey's needs at that time. The investigator testified that Mother acknowledged her life was unstable, Grandmother used crack, her other relatives were not supportive, she had no financial support, and she had moved from one location to another to get the resources she needed. Regarding work, the investigator said Mother admitted prostituting herself with one of the alleged fathers in order to get back the food stamp card that Grandmother had sold to the alleged father.

*Family and Fictive Kin Placement Options Fail*

The Department looked into relatives or alternate placements. Mother gave the name of her sister, but her sister was not able to help. A family friend, Ms. G., was considered for placement as well, but Ms. G. was physically unable to care for a child. The investigator said, without elaborating, Great Grandmother was not a good option. An alleged father later signed a waiver of interest.

The Department also requested home studies on a Ms. D. and a Mr. B. Ms. D. is Mother's stepmother, but Mother's stepmother had financial and drug issues. Mr. B. is Mother's brother. The Department expressed safety concerns regarding his home. The conservatorship worker said the Department tried to set up a family group conference, but Grandmother said there were no relatives who could help.

The Department initially placed both Mother and Zoey with a family friend, Ms. L., but that placement broke down after about a week. The investigator said Mother indicated she no longer wanted to live with Ms. L. and did not want to be

3

forced to take care of a small child.  Ms. L. stated she was done with the process and did not want to be considered for placement.  Ms. L. related she had been trying to help Mother and her family for years.  Ms. L. and Mother brought Zoey back to the Department and asked that Zoey be placed in foster care.  Both thought foster care was appropriate.  The investigator said because Mother was seventeen, she could have gone into foster care with Zoey, but Mother declined, saying she was not interested in taking care of a baby or ready to do so.

### Zoey's Medical Issues

The Department's conservatorship worker said Zoey was medically needy. Zoey had aspiration issues that required ongoing specialist care and a heart murmur that required follow-up.  Zoey received therapy twice weekly for eating issues.  Zoey required thickened liquids.  Zoey would breathe thin liquids into her lungs, which would cause congestion and make breathing difficult.  Due to weakened trunk, leg, and arm issues, Zoey was delayed in her motor skills, was receiving therapy for them as well, and was making progress.  The doctor thought Zoey's heart murmur would close up on its own and, therefore, did not require any special care.  Zoey had been in a dual-licensed foster home since September 1, 2013, that was meeting Zoey's physical and medical needs.

Mother knew Zoey had problems with swallowing and aspiration, which required Zoey to drink thicker liquids.  Mother said that was something she could handle.  Mother said she knew the basic things about taking care of a baby, and what she did not know, she would learn by asking a doctor.  The conservatorship

4

worker, however, did not think Mother could meet Zoey's medical, physical, or emotional needs. The Court Appointed Special Advocate (the CASA volunteer) agreed Zoey was a medically needy child and Mother had not even scratched the surface of what she needed to do to care for Zoey.

*The Service Plan*

The Department prepared a service plan for Mother, and the Department gave Mother her service plan on August 2, 2013—about ten months before trial. The service plan required Mother to undergo an assessment through MHMR, complete parenting classes, undergo a drug and alcohol assessment and follow through on any recommendations, obtain stable housing, obtain stable employment, and demonstrate an ability to care for Zoey. Regarding Mother's unstable housing, the conservatorship worker said moving from home to home with various different individuals with unknown criminal histories or drug use was a concern. The conservatorship worker had no verification of any employment. The conservatorship worker thought Mother had an eighth grade education and did not have, to the conservatorship worker's knowledge, any special skills. The conservatorship worker said Mother did not complete her parenting classes and individual counseling. MHMR had no record of Mother coming to it for an evaluation. Mother did not complete a drug assessment or any drug assessment program. The conservatorship worker concluded it was fair to say Mother did not cooperate in her court-ordered services. Because Mother had transportation barriers, the Department provided Mother with four or five bus passes, but when

5

Mother did not use them, the Department stopped issuing bus passes to Mother. Mother had no personal transportation but relied, instead, on family members.

Mother testified she did not attend services because they cost money and because the telephone numbers for the services were wrong. Mother said she was turned away from parenting classes because they required money. The conservatorship worker, however, stated the Department would have paid for all services, including the drug tests. Mother said transportation was also a major problem and she told the Department about it, but the Department's only response was to give her three bus passes.

*The Visits and Bonding*

According to the conservatorship worker, Mother attended only about thirty percent of her visits. The conservatorship worker observed seven or eight visits and said Mother would attend to Zoey but would hand Zoey off to someone else if Zoey cried. The conservatorship worker did not think Zoey recognized or had a bond with Mother. Mother provided neither supplies nor gifts.

The conservatorship worker said that since January 2014 until the trial in May 2014, Mother had visited Zoey only three times, which was detrimental to Mother's ability to bond with Zoey. The conservatorship worker did not think Zoey had bonded to Mother because Zoey appeared confused when looking at Mother and appeared to have difficulty remembering Mother.

In contrast, Mother said she enjoyed her visits with Zoey. Mother thought Zoey had some bond with her. Mother acknowledged it was hard to bond with someone when contact was not regular, but she nevertheless felt a bond.

The CASA volunteer testified she observed visits between Zoey and Mother, that Mother was happy to see Zoey, and that Mother was engaged with Zoey. She observed nothing inappropriate or disturbing about the visits. However, the CASA volunteer said Mother's failure to attend many visits concerned her very much. The only other concern the CASA volunteer had was that Mother seemed uncomfortable or unsure of herself when Zoey cried, so Mother would hand Zoey off to someone else who was also attending the visit. The CASA volunteer attributed it to Mother's inexperience.

*Stability of Housing*

The conservatorship worker described Mother's situation as transient. The conservatorship worker said that over the course of the case, Mother had lived in multiple homes with various people. The conservatorship worker said Mother had lived with Grandmother, Great Grandmother, friends in Fort Worth, friends in Arlington, and then friends in Fort Worth. The conservatorship worker said moving was hard on a baby and developmentally children needed stability, structure, safety, and familiarity with the people in the home.

Mother admitted moving from time to time. Mother said she moved in search of stability for her and Zoey. When she felt a home was unstable, she would move and try to find something better. Mother testified that at the time of

7

the termination trial she was living with a friend and had been living there two weeks. Living in the home were her friend, her friend's sister, her friend's sister's baby, her friend's mother, and her friend's father, who was a pastor. Mother said everyone got along and it was a stable environment. No one in the home, including Mother, used drugs, and Mother had access to her friend's car.

### *Mother's Marijuana Use*

Mother acknowledged Zoey was born positive for marijuana. Mother also acknowledged the most likely reason Zoey tested positive was because Mother was smoking marijuana. Mother admitted smoking marijuana in the past, admitted smoking marijuana while not knowing she was pregnant, but denied smoking marijuana after learning she was pregnant. Mother said she tested positive for marijuana in March 2013 because she was around people who were smoking and not because she personally was smoking.

The conservatorship worker said the Department arranged for Mother to take a drug test a week before trial. Mother failed to make the appointment. The conservatorship worker said when a parent fails to take a drug test, the Department presumes the result would have been positive.

### *Whether Mother was Bipolar or Suicidal*

The conservatorship worker said Mother admitted to her that Mother was bipolar. Mother, however, denied telling the investigator she was bipolar. Mother denied ever being clinically diagnosed as having a bipolar disorder, did not believe she had a bipolar disorder, and had no idea why the Department thought

8

she had a bipolar disorder. She acknowledged having been evaluated at Trinity Springs but denied being diagnosed as bipolar.

Mother also denied trying to commit suicide. Mother said she was admitted to a hospital for an evaluation. Mother explained that Grandmother signed her into the hospital, and it was Grandmother who said Mother was suicidal.

### *Mother's Employment*

Mother said she was currently working as a cashier at Braum's. She started at Braum's two days before trial. Mother said she made eight dollars an hour and anticipated getting a raise every ninety days. Mother planned on working at Braum's until she could get a better job. Before that she had helped her brother, who was an auto mechanic, and acknowledged otherwise never having had any stable employment. Mother also acknowledged that other than odd jobs, she did not have any other source of income and that she did not receive any type of governmental assistance.

Mother denied ever prostituting herself. Mother said Grandmother exchanged food stamps for money with someone named Hector, and Hector gave Mother gifts while Mother was pregnant. Mother thought that possibly explained why others thought she was prostituting herself. Mother denied having any sexual relations with Hector.

### *Mother Attempts to Improve Her Education*

Mother said she had been attending Everest College for the past three months and was trying to get her GED, which she thought might take another six months. Mother traveled to Everest College by taking the bus with passes given to her by either her friends or her mother. After getting her GED, she planned to continue at Everest College to earn either a two-year or four-year degree. She thought getting a better education would enable her to obtain a better job and earn more money.

*The Department's Plan - Adoption*

The conservatorship caseworker thought termination was in Zoey's best interest and explained that growing up in foster care was difficult for children. Termination would make Zoey available for adoption, and adoption offered Zoey familial permanency. The conservatorship worker said the Department had made reasonable efforts to return Zoey to Mother and did not think Mother had shown she could provide a safe and stable home. The conservatorship worker said the Department's plan was to have the current caregivers adopt Zoey. Zoey's current foster parents were committed to providing her with a forever home.

*Mother's Plans*

At trial, Mother testified she loved Zoey and wanted to care for her. Mother thought she was capable of taking care of Zoey. Mother stressed she now had a stable home and planned on having Zoey placed with her there. Mother indicated she had spoken to everyone in her new home and everyone was good

10

with Mother bringing Zoey home with her. Mother believed they would provide a good support system.

Mother said she was only seventeen when Zoey was born. She now had a valid ID, a job, and a home, and she was attending school. She said she had everything she needed and, if given more time, would be able to provide for Zoey. Mother said that without an income and without stable transportation, she had not been able to work her services. Now that she had an income and stable transportation, she was more independent. Mother did not have a driver's license but nevertheless intended to drive her friend's car. Mother acknowledged doing so was not safe, but she intended to work on getting a driver's license too.

## II. The Trial Court's Findings and Mother's Issue

The trial court found grounds for termination under subsections 161.001(1)(D) (endangering conditions or surroundings), 161.001(1)(E) (endangering conduct), 161.001(1)(N) (constructively abandoned child), and 161.001(1)(O) (failure to comply with court order). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), (O) (West 2014). Mother does not contest these findings. The trial court also found termination was in Zoey's best interest. *See* Tex. Fam. Code Ann. § 161.001(2). In one issue, Mother attacks both the legal and factual sufficiency of the evidence to support that finding.

## Standards of Review

### *Termination Considerations Generally*

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 563; *Holick*, 685 S.W.2d at 20. The rights of natural parents, however, are not absolute, and the rights of parenthood are accorded only to those fit to accept the accompanying responsibilities. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). The purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct. *Id.*

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001 & 161.206(a); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination

12

proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in section 161.001(1) of the Texas Family Code and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(1)–(2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.— Fort Worth 2012, no pet.).

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). But prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2014).

*The Legal Sufficiency Standard of Review*

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged finding was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* If we determine that no reasonable factfinder could form a firm belief or conviction that the grounds or best interest for termination were proven, then the evidence is legally insufficient, and we must render judgment for the parent. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

*The Factual Sufficiency Standard of Review*

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief about the truth of the allegations. Tex. Fam. Code § 161.001; *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence used to establish grounds under subsection (1), such as endangerment and abandonment, may prove probative when establishing best interest under subsection (2) of section 161.001 of the Texas Family Code. *C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include:

    (A)    the desires of the child;

    (B)    the emotional and physical needs of the child now and in the future;

    (C)    the emotional and physical danger to the child now and in the future;

15

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807.

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### III. Discussion and Application

*The Desires of the Child*

Regarding the desires of the child, Zoey was approximately ten months old at the time of trial. In the absence of evidence regarding Zoey's desires, Mother argues this factor effectively does nothing to support the best interest finding. We agree this factor is inapposite to this case.

16

*The Emotional and Physical Needs of the Child Now and in the Future*

Regardless of who raised Zoey, the record revealed that she was a medically needy child. The record demonstrated that the foster family, which also planned to adopt Zoey should Zoey become available for adoption, was meeting Zoey's physical and medical needs. Conversely, there was evidence Mother at times simply declined to care for Zoey. There was also evidence suggesting Mother's and Zoey's placement with Ms. L. fell apart because Mother did not want to be forced to take care of Zoey and wanted to leave Mother's own placement with Ms. L. for that reason. Finally, both the conservatorship worker and the CASA volunteer noted Mother was uncomfortable taking care of Zoey when she cried and would hand Zoey to someone else rather than care for Zoey herself.

There was also evidence that children developmentally need stability. Regardless of the explanation, Mother moved frequently. Although Mother found her current housing stable, she had been living in it only two weeks before trial. Mother's testimony revealed that she would move out of housing when it became unstable in search of stability. The evidence suggested Mother's housing destabilized with time, and the trial judge might not have shared Mother's optimism about her current placement, especially if a medically needy infant were added to the home and if Mother showed reluctance to care for the child.

The trial court could have reasonably concluded Mother had not been able to meet Zoey's emotional and physical needs while the case was pending and

would not be able to meet them thereafter. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("A fact finder may infer from a parent's past inability to meet a child's physical and emotional needs an inability or unwillingness to meet a child's needs in the future."). This factor weighs in favor of termination being in Zoey's best interest.

*The Emotional and Physical Danger to the Child Now and in the Future*

Other than Mother's use of marijuana during the pregnancy, Mother argues the record is devoid of any evidence of physical or emotional harm to Zoey. The question is not one of actual harm but one of endangerment. The Department did not need to prove that the parent's conduct creating the danger was directed at the child or that the child actually suffered injury to succeed in terminating parental rights. *Boyd*, 727 S.W.2d at 533. "Endanger" means to expose a child to loss or injury or to jeopardize the physical or emotional well-being of the child. *Id.* Mother has not contested the trial court's findings that she had knowingly placed or had knowingly allowed Zoey to remain in conditions or surroundings that endangered Zoey's physical or emotional well-being or that she had engaged in conduct or knowingly placed Zoey with persons who had engaged in conduct that endangered Zoey's physical or emotional well-being. As noted above, Mother showed an unwillingness to care for Zoey. The trial court could have reasonably concluded that merely because Mother was now eighteen and not seventeen changed nothing. *See J.D.*, 436 S.W.3d at 118 ("A fact finder may infer from a parent's past inability to meet a child's physical and emotional needs

18

an inability or unwillingness to meet a child's needs in the future."). Similarly, as noted above, the trial court could have reasonably found Mother's housing instability represented a danger to Zoey's development. Mother's refusal to take a drug test a week before trial could have persuaded the trial court that Mother's marijuana usage was not a thing of the past. *See In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (stating that factfinder could reasonably infer that failure to submit to drug screening was due to drug usage); *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (stating that history of drug abuse was relevant to best interest). We conclude this factor weighs in favor of termination being in Zoey's best interest.

*The Parental Abilities of the Individuals Seeking Custody*

Zoey's foster family and prospective adoptive family were meeting her physical and emotional needs. Mother's handing Zoey off to another person when Zoey cried suggested Mother was inexperienced. Mother did not complete her parenting classes. The CASA volunteer thought Mother had not yet scratched the surface of what she needed to do to care for Zoey. This factor weighs in favor of termination being in Zoey's best interest.

*The Programs Available to Assist These Individuals to Promote the Best Interest of the Child*

Mother failed to take advantage of the services the Department offered her. When offered the opportunity to go into foster care along with Zoey, Mother declined. Mother received no government assistance. The trial court could have

19

concluded Mother failed to access assistance for herself and would fare no better for Zoey.  This factor weighs in favor of termination being in Zoey's best interest.

*The Plans for the Child by These Individuals or by the Agency Seeking Custody*

Mother argues she had taken many steps to ensure the stability and safety of both her and Zoey's future.  Mother also argues she had obtained a job, had stopped using drugs, was working toward getting her GED, and thereafter planned to earn a college degree.  All these steps were laudable, but the trial court could have reasonably concluded questions remained.  Mother refused to take a drug test a week before trial, which suggested she would have tested positive.  *See C.A.B.*, 289 S.W.3d at 885 (factfinder could reasonably infer that failure to submit to drug screening was due to drug usage).  Mother obtained her job only two days before trial.  *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) (stating that even significant evidence of improved conduct, especially if it is of short duration, does not conclusively negate the probative value of a history of irresponsible choices); *In re B.D.M.*, No. 02-13-00388-CV, 2014 WL 1510131, at *8 (Tex. App.—Fort Worth Apr. 3, 2014, no pet.) (mem. op.) (stating that recent improvement alone is not sufficient to avoid termination of parental rights); *In re K.D.C.*, No. 02-12-00092-CV, 2013 WL 5781474, at *16 (Tex. App.—Fort Worth Oct. 24, 2013, no pet.) (mem. op.) (same).  With or without Zoey in Mother's care, whether Mother had the necessary discipline to continue going to school and obtain her GED remained to be seen.  There was evidence Mother possessed only an eighth grade education, and the trial court could have

20

reasonably questioned Mother's optimism about making up four years of high school within a matter of months.

The Department's plan was to have Zoey's current caregivers adopt Zoey. The current caregivers could give Zoey a forever home. They were meeting Zoey's physical and medical needs. The Department's plan offered stability. Mother's plan did not offer the same stability. This factor weighs in favor of termination being in Zoey's best interest.

*The Stability of the Home or Proposed Placement*

Mother asserts she had a stable home in which no drugs were used. She was living with a friend, and the friend's father was a pastor. Mother contends the other members of the household would welcome Zoey and would provide a good support system.

Mother had, however, lived in her current home only two weeks at the time of trial. The trial court could have concluded whether the current home was stable remained to be seen. Mother's previous homes consistently became unstable. We conclude that notwithstanding Mother's optimism, two weeks was insufficient to show stability. *See J.O.A.*, 283 S.W.3d at 346 (stating that even significant evidence of improved conduct, especially if it is of short duration, does not conclusively negate the probative value of a history of irresponsible choices); *B.D.M.*, 2014 WL 1510131, at *8 (stating that recent improvement alone is not sufficient to avoid termination of parental rights); *K.D.C.*, 2013 WL 5781474, at

21

*16 (same). This factor weighs in favor of termination being in Zoey's best interest.

*The Acts or Omissions of the Parent which May Indicate that the Existing Parent-Child Relationship is not a Proper One*

Mother contends the record is devoid of any acts or omissions toward Zoey. The question is not whether the acts or omissions were directed at Zoey. The question is whether there were any acts or omissions that suggested the parent-child relationship was not a proper one. The evidence showed there were such acts and omissions. When Zoey was born, Mother indicated she was not ready to take care of her. When Zoey and Mother were both placed with Ms. L, Mother again balked at taking care of Zoey and wanted to leave Ms. L. Mother attended only about thirty percent of her scheduled visits with Zoey. In the approximately four months preceding trial, Mother visited Zoey only three times. Mother was uncooperative about working services that would have improved her parenting. *See In re A.B.*, 269 S.W.3d 120, 129 (Tex. App.—El Paso 2008, no pet.) (discussing parent's failure to complete service plan when determining best-interest). When drug usage was an issue in the case, Mother failed to take a drug test a week before trial. *See C.A.B.*, 289 S.W.3d at 885 (stating that factfinder could reasonably infer that failure to submit to drug screening was due to drug usage); *D.M.*, 58 S.W.3d at 814 (stating that history of drug abuse relevant to best interest). These facts weigh in favor of termination being in Zoey's best interest.

22

*Any Excuse for the Acts or Omissions of the Parent*

Mother acknowledges she did not complete her services, but she maintains this was due to a lack of transportation and due to the Department's giving her incorrect telephone numbers for the various services. There was, however, testimony that the Department had provided Mother with bus passes but had stopped providing them when Mother did not use them. Mother herself testified about successfully using bus passes to go to Everest College. The trial court could have concluded Mother knew how to use the bus system when properly motivated and her failure to work her services was more a function of lack of motivation than a function of lack of transportation. Regarding the telephone numbers, the trial court could have concluded that any difficulty with incorrect numbers could have and should have been corrected with contact and communication with the conservatorship worker. Assuming the phone numbers were incorrect, Mother's inability to obtain correct phone numbers again showed a lack of initiative and motivation.

Mother acknowledged she moved around quite a bit, but she maintained the moves were motivated by her search for stability and her search was ultimately successful, as she considered her current living arrangements stable. The trial court could have, however, concluded Mother's stated quest for stability was itself an acknowledgement of instability. The trial court could have also found that the two weeks Mother had been in her current home was no guaranty of future stability. *See J.O.A.*, 283 S.W.3d at 346 (stating that even significant

23

evidence of improved conduct, especially if it is of short duration, does not conclusively negate the probative value of a history of irresponsible choices); *B.D.M.*, 2014 WL 1510131, at *8 (stating that recent improvement alone is not sufficient to avoid termination of parental rights); *K.D.C.*, 2013 WL 5781474, at *16 (same).

In short, the trial court could have concluded Mother's explanations, excuses, and optimism were all the product of immaturity. The trial court could have also concluded Mother was no more ready at eighteen than she was at seventeen to raise a medically needy child. *See In re T.S.*, No. 14-05-00348-CV, 2006 WL 1642218, at *9 (Tex. App.—Houston [14th Dist.] June 15, 2006, no pet.) (mem. op.) (stating that despite parent's youth, focus remained on inability to care for children and risks children would be exposed to if returned to parent). We find this factor weighs in favor of termination being in Zoey's best interest.

*Other Factors*

There was evidence Zoey had not bonded to Mother. Mother and Zoey lived together about one week while with Ms. L. immediately after Zoey's birth. Thereafter Mother attended only about thirty percent of her visits with Zoey. In the four months leading up to trial, Mother had seen Zoey only three times. Mother maintained there was a bond despite the sporadic and infrequent visits. The conservatorship worker, however, thought Zoey had difficulty recognizing Mother and had no bond with her. Although it was undisputed Mother loved Zoey and behaved appropriately during visits, the trial court could have

24

reasonably found that Zoey had not bonded to Mother. *See Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 682 (Tex. App.—Austin 2005, no pet.) (stating that best interest focus is on the child, not the needs and desires of the parent). Placing Zoey with Mother would have meant breaking the established relationship Zoey had with her current placement, which she had had since September 1, 2013 (about eight of her ten months of life), for the purpose of establishing a nonexistent or, at best, very attenuated bond with Mother. This weighs in favor of termination being in Zoey's best interest.

*Conclusion*

Reviewing the evidence in the light most favorable to the trial court's best interest finding and concluding such finding was not unreasonable, we hold the trial court could have formed a firm belief or conclusion that best interest was proven. *See J.F.C.*, 96 S.W.3d at 266; *J.D.P.*, 180 S.W.3d at 573. The evidence was legally sufficient. Similarly, after reviewing the entire record, we hold a factfinder could have reasonably formed a firm conviction or belief that termination was in Zoey's best interest. *See C.H.*, 89 S.W.3d at 28. The evidence was factually sufficient. Using either standard, the Department met the clear-and-convincing burden of proof. *See* Tex. Fam. Code Ann. § 161.001. We overrule Mother's issue and affirm the trial court's judgment.

25

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL:  GARDNER, MEIER, and GABRIEL, JJ.

DELIVERED:  October 23, 2014